**EXHIBIT A TO AFFIDAVIT OF SANDRA E. KAHN**

**Excerpts from Deposition of Demerew Yohannes**

1                    UNITED STATES DISTRICT COURT
2                    DISTIRCT OF MASSACHUSETTS

3

4

5    DEMEREW W. YOHANNES,
                              Plaintiff
6
     v.
7
     CENTRAL PARKING SYSTEMS, INC.,
8                             Defendant

9

10

11

12            DEPOSITION OF:   DEMEREW W. YOHANNES,

13        taken before Roxanne C. Costigan, Notary Public

14        Stenographer, at the law offices of MORSE,

15        BARNES-BROWN & PENDLETON, 1601 Trapelo Road,

16        Waltham, Massachusetts, on June 28, 2004.

17

18

19

20

     APPEARANCES:
21
     (See Page 2)
22

23

24                        Roxanne C. Costigan
                          Registered Merit Reporter


                Accurate Court Reporting * 1500 Main Street
                      Springfield, MA   01115
                         413-747-1806

```
 1    APPEARANCES:

 2    FOR THE PLAINTIFF:
      HRONES & GARRITY
 3    Lewis Wharf-Bay 232
      Boston, MA   02110-3927
 4    617-227-4019
              BY:   JESSICA D. HEDGES, ESQ.
 5
      FOR THE DEFENDANT:
 6    MORSE, BARNES-BROWN & PENDLETON
      1601 Trapelo Road
 7    Waltham, MA   02457
              BY:   SANDRA E. KAHN, ESQ.
 8    781-622-5930

 9    Also present:  Edwin Crean

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

1       A.    Yes.

2       Q.    Have you taken any steps to find out who

3    that person is?

4       A.    No, I did not.

5       Q.    Do you have any other basis for your

6    claims that defendant discriminated against you?

7       A.    No.

8       Q.    Am I right to say that your claim is that

9    you believe you were treated differently than Guiseppe

10   Verdi and another person who you believe Karen Morrell

11   was talking about at an unemployment hearing?

12      A.    Yes.

13      Q.    That is the entire basis for your claim of

14   discrimination against Central Parking?

15      A.    Yes.

16      Q.    You've now told me all of the people you

17   claim were treated differently than you in respect to

18   your claim of discrimination?

19      A.    Yes.

20      Q.    Why do you believe Mr. Verdi was treated

21   differently than you?

22      A.    That, I don't know, because of his color.

23      Q.    In what way do you believe he was treated

24   differently than you?

1    document when they give to me.

2         Q.    What document do you have?

3         A.    That hearing decision.

4         Q.    You have a copy of the decision?

5         A.    Yes.

6         Q.    Do you have a copy of the tape recording?

7         A.    No.

8         Q.    Do you know anything else that you haven't

9    told me about this individual who you believe was

10   suspended for not having a license and then allowed to

11   return to work?

12        A.    No.

13        Q.    Do you know whether he had a valid license

14   when he returned to work?

15        A.    That's what they say is he have a valid

16   license and then they return him.

17        Q.    So, your understanding is he was suspended

18   for not having a license, and then when he obtained a

19   valid license, he was allowed to return to work?

20        A.    Yes.

21        Q.    But you don't have any idea of how long

22   that period was?

23        A.    I don't know.

24        Q.    Or why he didn't have a valid license?

1          A.      I don't know.

2          Q.      Or for how long he had gone without having

3      a valid license?

4          A.      I don't know.

5          Q.      Or what his communications were about his

6      license status?

7          A.      I didn't know.

8          Q.      Do you know if this individual was part of

9      the license audit that was held in May 2003?

10         A.      I just don't know.

11         Q.      You don't know what garage he worked at?

12         A.      I don't know.

13         Q.      Do you know what his job was?

14         A.      I don't know.

15         Q.      Do you know if his job involved driving

16     cars?

17         A.      Really, I don't know.

18         Q.      So, he might have been a cashier?

19         A.      I don't know.  That's what I say, I don't

20     know.  If I know it, I will say.

21         Q.      Is there any other way in which you claim

22     that defendant has discriminated against you?

23         A.      Like I say, the previous one, it is only

24     my origin, Ethiopian.

1    Q.    The way in which you believe defendant

2  discriminated against you is by treating you

3  differently than Guiseppe Verdi and this other person

4  that Karen Morrell spoke about at the unemployment

5  hearing?

6    A.    Yes.

7    Q.    Did you complain to anyone at Central

8  Parking about this discrimination?

9    A.    No.

10    Q.    No?

11    A.    No.

12            MS. KAHN:  Mark this as an exhibit,

13    please.

14                (Exhibit 1, marked)

15                (Exhibit 2, marked)

16    Q.    (By Ms. Kahn)  Mr. Yohannes, I'm showing

17  you a document that's been marked as Defendant's

18  Exhibit Number 1.  Do you recognize this document?

19    A.    Yes.

20    Q.    What is this?

21    A.    I ask him to return me my job, to put me

22  back in my work.

23    Q.    Is this a letter that you wrote to Mr.

24  Edwin Crean --

1          Q.     Who in particular at Central Parking do

2     you believe discriminated against you on the basis of

3     your race and national origin?

4          A.     To my deepest heart, the one who fire me,

5     he has -- he doesn't like my race.

6          Q.     Who is that?

7          A.     The person who fire, Mr. Crean.

8          Q.     Is that Ed Crean?

9          A.     Yes.

10          Q.     Why do you believe that he doesn't like

11     your race?

12          A.     That, I don't know that one.

13          Q.     Are there any facts on which you base your

14     belief that he doesn't like your race besides what

15     you've told me about already today?

16          A.     I don't know that one.

17          Q.     Did he ever say anything to you that was

18     discriminatory?

19          A.     No, he didn't say to me.

20          Q.     Did he ever make any racial slurs towards

21     you?

22          A.     No.

23          Q.     Do you have any other reason to believe

24     that Mr. Crean was biased against you because of your

1    that.

2         Q.    Well, did you ever have a problem working

3    with him before May of 2003?

4         A.    Just he stopped, one or two years, I saw

5    him in the garage, he came in the garage and a little

6    conversation, not a conversation, a little

7    conversation, he give it to me, that's it.

8         Q.    So, you didn't see him very often?

9         A.    No.

10        Q.    In the two years, almost two years that

11   you worked at the North End Garage, how many times do

12   you think you saw Mr. Crean?

13        A.    Sometimes when I go to the office to pick

14   up some paper, and then I saw him, I see him there.

15        Q.    Did you have any further conversation

16   besides the exchange of pleasantries, hi, how are you?

17        A.    Unless I say hi.  He never say to me hi.

18        Q.    So, very little conversation with him?

19        A.    Just hi, how are you.

20        Q.    Before May of 2003, did you have any

21   reason to believe that Mr. Crean discriminated against

22   you?

23        A.    No, I don't.

24        Q.    Before May of 2003, did you have any

1    reason to believe he was biased against you because of

2    your race?

3         A.    No, I did not.

4         Q.    You mentioned your immediate supervisor,

5    is that Mr. Caliri?

6         A.    Yes.

7         Q.    Robert Caliri?

8         A.    Yes.

9         Q.    What was his position?

10        A.    Senior project manager.

11        Q.    You reported directly to him?

12        A.    Yes.

13        Q.    Do you have any reason to believe that Mr.

14   Caliri was biased against you because of your race?

15        A.    No.

16        Q.    Have you had any conversations with any of

17   defendant's employees about your lawsuit or your claims

18   of discrimination?

19        A.    Defendant?

20        Q.    Have you had any conversations with any

21   Central Parking employees about your claim of

22   discrimination?

23        A.    No.

24        Q.    Have you talked to any former employees of

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS


C.A. No. 03-12390 NG


DEMEREW W. YOHANNES,                )
            Plaintiff              )
VS.                                )
                                   )
CENTRAL PARKING SYSTEMS, INC.,     )
            Defendant              )


DEPOSITION OF DEMEREW YOHANNES,

taken before Debra Vance, Notary Public

Stenographer, pursuant to the provisions of Rule

30 of the Massachusetts Rules of Civil Procedure,

at the offices of MORSE, BARNES-BROWN &

PENDLETON, P.C., 1601 Trapelo Road, Waltham,

Massachusetts on August 26, 2004, continuing at

10:00 a.m.


 APPEARANCES:   (See Page 2)



                Debra A. Vance
          Notary Public Stenographer


*Accurate Court Reporting*                    *1500 Main Street, Suite 1412*
                                              *Springfield, MA 01115*
                                              *413-747-1806*

FOR THE PLAINTIFF:

HRONES & GARRITY
Lewis Wharf, Bay 232
Boston, Massachusetts  02110
617-227-4019
            BY:  JESSICA D. HEDGES, ESQ.

FOR THE DEFENDANT:

MORSE, BARNES-BROWN & PENDLETON, P.C.
1601 Trapelo Road
Waltham, Massachusetts  02451
781-622-5930
            BY:  SANDRA E. KAHN, ESQ.

ALSO PRESENT:

Edwin Crean
Lionel Porter

1        A.    Because they terminated her and bring

2   her.   Because, number one, she is a woman and

3   black, Ethiopian.   She was terminated and bring

4   his wife.   That shows to me that one.

5        Q.    Did she give you any other reasons

6   why she believed that she was terminated because

7   of race?

8        A.    That's the only one she told me.

9        Q.    Did you ask her if she would be a

10  witness for you in this matter?

11       A.    At that moment, I didn't ask her.

12       Q.    Do you have plans to ask her?

13       A.    Yes.

14       Q.    You've also listed Solomon Lemma.

15  Who is Mr. Lemma?

16       A.    Mr. Lemma is working for Central

17  Parking a long time as operations manager with

18  Mr. Crean.   He knows more detail about Central

19  Parking, specifically Mr. Crean is biased against

20  Ethiopians.   He will testify exactly and

21  precisely.

22       Q.    And when was the last time you spoke

23  with Mr. Lemma?

24       A.    I talked to him for first three

1    I go from the office I become as a bookkeeper,

2    the schedule is as a bookkeeper to assistant

3    manager over there.  So I didn't ask, I didn't

4    say anything, just go to work.  That's it.

5         Q.    Let me draw your attention to the

6    third paragraph in No. 5, Exhibit 5.  In the

7    second sentence, do you see where it says you'll

8    be an at-will employee and would be subject to

9    all terms and conditions of the Central Parking

10   Corporation work rules?

11        A.    Yes, I do understand.

12        Q.    So you understood that even after the

13   switch to Massachusetts your employment was still

14   at will?

15        A.    I do understand.

16        Q.    In June of 2001, did you start off in

17   the North End Garage?

18        A.    No.

19        Q.    Where were you when you first came up

20   here?

21        A.    I was MBTA.  It was in Malden.

22        Q.    And was it that September of 2001

23   that you switched to a different garage?

24        A.    Yes.

47

1      correct?

2              A.    Yes.

3              Q.    Did you read this before you signed

4      it?

5              A.    Yes.

6              Q.    At the time you started working for

7      Schwartz Parking in 1992, did you have a valid

8      driver's license?

9              A.    Yes.

10             Q.    Was that issued by the state of

11     Connecticut?

12             A.    Yes.

13             Q.    Directing your attention to Exhibit

14     No. 4, your application for employment, do you

15     see where on this it asks you on the application

16     it asks you if you have a valid driver's license?

17             A.    Yes.

18             Q.    And you answered yes?

19             A.    Yes.

20             Q.    And you did have a valid driver's

21     license at the time?

22             A.    Yes.

23             Q.    When you applied for this job with

24     Central Parking, was it your understanding that

51

1          Q.     To go to?

2          A.     The Motor Vehicle.

3          Q.     In Massachusetts?

4          A.     Yes.

5          Q.     And did you go to the Motor Vehicle

6     Department in Massachusetts?

7          A.     Yes.

8          Q.     When did you do that?

9          A.     It is in January.

10         Q.     Of 2003?

11         A.     Yes.

12         Q.     And what happened?

13         A.     They told me we can't change your

14    driver's license.  You have a lien against you.

15         Q.     And what did you understand them to

16    mean when they said you had a lien against you?

17         A.     I did not understand them.  They told

18    me that South Carolina has a lien on you, the

19    South Carolina Department of Motor Vehicles.  And

20    then they didn't tell me, so they gave me the

21    phone number.  I call.

22         Q.     What was the phone number for?

23         A.     The Motor Vehicle Department in South

24    Carolina.

1      cashier and then I give a ticket when it is busy.

2      Because I work for the company.  This is

3      precisely I want to tell you the truth and

4      honesty.  I move cars.  I'm not saying I lie.

5      Because I move cars, moving from their entrance,

6      move the others.  The only job over there at that

7      moment is giving ticket to the customer when they

8      coming.  That is the only thing I do.

9            Q.    So your testimony is that you did

10     move cars within the parking garage?

11                 MS. HEDGES:  Can you clarify as to

12            the time, please, what period of time?  It

13            would be helpful before or after the

14            license.

15            Q.    (By Ms. Kahn) Is your testimony that

16     there was a difference in whether you moved

17     cars --

18            A.    And driving cars.  There's a

19     difference.

20            Q.    Before or after your Connecticut

21     license expired?

22            A.    Before it expired, my license.

23            Q.    Let's try this:  Your Connecticut

24     license expired in February 2003?

66

1          A.     Yes.

2          Q.     Before February 2003, say

3     January 2003 --

4          A.     January or December or before that.

5          Q.     -- you did from time to time move

6     cars --

7          A.     Yes, move cars.

8          Q.     -- in your job with Central Parking?

9          A.     Yes.

10          Q.     And moving the cars involved sitting

11     in the driver's seat, turning it on, and moving

12     the car?

13          A.     Yes.

14          Q.     After February 2003, is it your

15     testimony that you did not ever move a car at

16     Central Parking?

17          A.     I did not ever move a car.

18          Q.     And was that because it was your

19     understanding that you didn't have a valid

20     driver's license?

21          A.     Yes.

22          Q.     After your Connecticut license

23     expired, did you drive your own car?

24          A.     No.

79

```
1          Q.    And did you ever park the car as
2     you've described while you were working for
3     Central Parking?
4          A.    Did I ever drive a car, what does
5     that mean?
6          Q.    I said park a car.  You just
7     described how the customer would drop off a car
8     and an employee would take it and put it in a
9     space.
10         A.    Yes.
11         Q.    Did you ever do that?
12         A.    No.
13         Q.    Never?
14         A.    That I could say never, I say the
15    driver.
16         Q.    Mr. Yohannes, did you ever take a car
17    from a customer and park it in a spot during the
18    time you were employed by Central Parking?
19         A.    No.
20         Q.    Not once during the whole time?
21         A.    Before my license expired I did many
22    times.
23         Q.    Okay.  So let's try that again.  At
24    any time during your employment with Central
```

1          Parking, did you park a customer's car?

2                    A.    Before my license is expired --

3                         MS. HEDGES:  Listen to the question.

4              Did you park a car at any time during the

5              time of your employment?

6                    THE WITNESS:  Yes, I did.

7                    Q.    (By Ms. Kahn) And your testimony is

8      that you only did that before February of 2003?

9                    A.    Yes.

10                   Q.    But before February 2003, you did

11     from time to time park customer's cars?

12                   A.    Yes, from time to time.

13                   Q.    So if Mr. Caliri says that your job

14     involved parking cars, he would not be lying

15     about that, right?

16                   A.    Whether he's lying or not is not my

17     attention.  He can say anything he want, but I

18     just said exactly what I told you.

19                   Q.    That before February 2003 you did

20     drive cars for Central Parking?

21                   A.    Moving the car, not all the time.  It

22     is specifically sometimes, sometimes.

23                   MS. HEDGES:  Just answer the

24              question.

*Accurate Court Reporting*                    *1500 Main Street, Suite 1412*
                                              *Springfield, MA 01115*
                                              *413-747-1806*

1    to show you what's been marked as Exhibit 9.

2    Please take a look at that and let me know if you

3    recognize this?

4        A.    Yes.

5        Q.    Is this also a part of the Central

6    Parking handbook?

7        A.    Yes.

8        Q.    On the left side there, it says,

9    "behavior that could result in immediate

10   termination," and then it lists 13 items?

11       A.    Yes.

12       Q.    And drawing your attention to No. 7,

13   that reads:  "Falsification of records, including

14   the employee's application, or willful

15   misrepresentation of facts."  Did I read that

16   accurately?

17       A.    Yes.

18       Q.    At the bottom of that list it says:

19   "The above listing is not intended to be

20   all-inclusive."  Do you see that down there?

21       A.    Yes.

22       Q.    Was it your understanding that this

23   was a list of some things that could result in

24   immediate termination; is that right?

1          A.    Yes.

2          Q.    But that there could be other things

3    as well?

4          A.    Yes.

5          Q.    Was it your understanding that

6    putting a false fact in an employment application

7    could result in termination of employment?

8          A.    What is the question?

9          Q.    Was it your understanding that

10   putting a false fact in an employment

11   application, putting something untrue in your

12   employment application, could be a reason to

13   terminate an employee's employment?

14         A.    Yes.

15         Q.    And misrepresenting facts could

16   result in immediate termination?

17         A.    Yes.

18         Q.    Representing that you had a valid

19   driver's license if you did not have a valid

20   driver's license could be cause for termination?

21         A.    No.

22         Q.    Why not?

23         A.    No, it did not.

24         Q.    I'm not asking whether you did it.

1      you talk to your employer, Central Parking, at

2      all about whether you needed to change to a

3      Massachusetts license?

4          A.    No.

5          Q.    And you didn't try to get a

6      Massachusetts license until, you said, January of

7      2003?

8          A.    Yes.

9          Q.    At any time, did you -- withdraw.

10          You testified earlier that some of

11     these individuals that you've spoken to and asked

12     them to be witnesses for you no longer work at

13     Central Parking; is that correct?  They used to

14     work -- let me take them one at a time.

15          Mr. Mokennen, do you know if he ever

16     filed a charge of discrimination against Central

17     Parking?

18          A.    I don't know.

19          Q.    Do you know if he ever complained to

20     anyone about Central Parking --

21          A.    I don't know.

22          Q.    -- about discrimination?

23          A.    I don't know.

24          Q.    Do you know if Mr. Perrira ever

1          Q.    Do you recall submitting a complaint

2     in this case?

3          A.    What?

4          Q.    Isn't it the case that in your

5     complaint you allege that in March 2003 that was

6     the first time you tried to get a Massachusetts

7     driver's license?

8          A.    No.  I started in January.

9          Q.    In January of 2003, did you tell

10    anyone at Central Parking about the problem with

11    your license?

12         A.    In January, no.

13         Q.    At what point did you tell anyone at

14    Central Parking about the problem with your

15    license?

16         A.    After the memo they send in March or

17    something like that.

18         Q.    Are you referring to the letter or

19    memo from Karyn Poliseno asking to see everyone's

20    drivers' licenses?

21         A.    Yes.  The attendant, the valet

22    drivers first.

23         Q.    Wasn't that in June of 2003?

24         A.    No, May.

1      Q.     You think it was in May?

2      A.     Yes.

3      Q.     So it wasn't in March?

4      A.     It wasn't in March.

5      Q.     After the memo from Karyn Poliseno in

6  May of 2003, that was the first time you spoke to

7  someone in Central Parking about the problem with

8  your license?

9      A.     Yes.

10      Q.     Who did you speak to?

11      A.     I speak with Bob, Mr. Crean, and

12  Karyn Poliseno.

13      Q.     When you referred in your complaint

14  to your site supervisor, did you mean Bob Caliri?

15      A.     Yes.

16      Q.     When was the first -- who did you

17  speak to at the first conversation you had

18  about --

19      A.     Bob Caliri.

20      Q.     That would that have been in May of

21  2003?

22      A.     It should be.

23      Q.     Where were the two of you when you

24  talked?

```
 1              A.    Yes.

 2              Q.    For the purposes of our record, I

 3      think the earlier deposition we were referring to

 4      Karyn as Karyn Morrell.  Is it your understanding

 5      that that's the same person as Karyn Poliseno?

 6              A.    Yes.

 7              Q.    She got married and changed her name?

 8              A.    I don't know.

 9              Q.    In any case, it's the same person?

10              A.    The same person.

11              Q.    Did you, after this conversation with

12      Bob Caliri, talk to Karyn Poliseno?

13              A.    I don't know.

14              Q.    You don't remember?

15              A.    Did he talk to her?

16              Q.    Did you talk to her, to Karyn?

17              A.    Yes.

18              Q.    When did you talk to Karyn about your

19      license?

20              A.    Exactly after we discuss in May,

21      after Robert we discuss it.  After that I discuss

22      with her.  I called her and then I told her.

23              Q.    So you called her on the phone?

24              A.    Yes.
```

95

1          Q.     And was that still in May 2003?

2          A.     Yes.

3          Q.     Do you know when?

4          A.     I don't know the date.

5          Q.     And you told her that your

6     Connecticut license had expired?

7          A.     Yes.

8          Q.     And there was a lien on your license?

9          A.     Yes.

10         Q.     And you didn't currently have a

11     Massachusetts license?

12         A.     Yes.

13         Q.     What did she say to you?

14         A.     She say when you got it.  I say as

15     soon as I can and I will retain my license.

16         Q.     Did she say anything else to you?

17         A.     She didn't say anything.

18         Q.     About how long was that phone

19     conversation?

20         A.     About five minutes.

21         Q.     About how long was your conversation

22     with Bob Caliri?

23         A.     About 10, 15 minutes or so, 10 or 15

24     minutes I explained it to him.

1          Q.    You had been trying since January of

2     2003?

3          A.    That's my effort.  That's my effort.

4     I have to do it, because I have to go to work.  I

5     have to have my own driver's license.

6          Q.    You agree that you were trying

7     between January 2003 and May 2003 to get a

8     driver's license?

9          A.    Yes.

10         Q.    But you still hadn't been able to get

11    the lien removed?

12         A.    Because I have to back and forth,

13    yes.

14              MS. HEDGES:  Yes or no.

15              THE WITNESS:  Yes.

16         Q.    (By Ms. Kahn) Do you know of anyone

17    else at Central Parking that was given an

18    opportunity to renew an expired driver's license?

19         A.    Yes.  On the record, yes.

20         Q.    Who is it?

21         A.    I don't know his name, because it is

22    in the record which I give to my counselor.  It

23    is the person who was being the same time it

24    happened.  They gave him a chance to renew his

1        at your letter B titled "decision" and you've

2        pointed me to page, the third page of it, and

3        you're looking at -- is this where you're

4        instructing me to look, at No. 13?

5              A.    Yes.

6              Q.    The employee that's referred to

7        there, do you know the race or the national

8        origin of that employee?

9              A.    No.

10             Q.    So it's possible that that employee

11       could have the same race and national origin as

12       yourself?

13             A.    I don't know.

14             Q.    Do you know how long that employee

15       was given to obtain a valid license?

16             A.    I don't know.  They didn't give me

17       any chance.

18             Q.    Do you know what the circumstances

19       were under which that employee didn't have a

20       valid license?

21             A.    I don't know.

22             Q.    You don't know how long that person

23       was without a valid driver's license?

24             A.    I don't know.

1        Q.    It could have expired the day before?

2              MS. HEDGES:  Objection.

3              THE WITNESS:  I don't know.

4        Q.    (By Ms. Kahn) Do you believe that you

5    were treated differently than that person because

6    of your race and national origin?

7        A.    I don't know.  I don't understand

8    your question.

9        Q.    Is it your assertion that you were

10   treated differently than this person because you

11   allege you weren't given more time to renew your

12   driver's license or to obtain a driver's license?

13       A.    Yes.

14       Q.    And do you believe that that

15   difference in treatment was because of your race?

16       A.    Yes.

17       Q.    And why do you believe it was because

18   of your race?

19       A.    Because Mr. Crean has biased

20   inclination to Ethiopians.

21       Q.    And why do you believe he's biased

22   towards Ethiopians?

23       A.    There's no reason to fire me for

24   that.

*Accurate Court Reporting*                           *1500 Main Street, Suite 1412*
                                                     *Springfield, MA 01115*
                                                     *413-747-1806*