**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| DEMEREW W. YOHANNES, ) | |
|     Plaintiff, ) | |
| ) | |
|     v. ) | C.A. No. 03-12390-NG |
| ) | |
| CENTRAL PARKING SYSTEMS, INC., ) | |
|     Defendant. ) | |
| ) | |

**GERTNER, D.J.:**

**MEMORANDUM AND ORDER RE: SUMMARY JUDGMENT**
August 26, 2005

## I.    INTRODUCTION

Plaintiff, an Ethiopian man named Demerew W. Yohannes ("Yohannes"), has filed an employment discrimination lawsuit pursuant to Title VII against defendant, Central Parking Systems, Inc. ("Central Parking").  Plaintiff claims that, because of his race, he was unlawfully terminated from a position as Assistant Manager at defendant's valet parking garage.  In support of this argument, he relies primarily on a disparate treatment rationale. Defendant moves for summary judgment against plaintiff, contending that plaintiff cannot prove that he was qualified for the job or that defendant's stated reasons for his discharge were a pretext for discrimination.

Even with all reasonable inferences drawn in favor of plaintiff, he fails to create a genuine issue of material fact as to his disparate treatment claim, and thus cannot satisfy his burden of proving that defendant's reasons for discharge were pretextual.  Therefore, defendant's motion for summary judgment [docket entry # 26] is **GRANTED**.

## II.  FACTS[1]

Defendant operates pay parking facilities throughout Massachusetts, including the North End Garage, a valet parking facility in Boston.  Plaintiff was hired as an at-will employee to fill the position of Assistant Manager at this garage on June 4, 2001.  He was employed by defendant until he was fired on June 2, 2003.  Plaintiff's previous work experience included employment at Schwartz Parking (Central Parking's predecessor company) in Hartford, Connecticut, where he lived until he moved to Boston to commence employment with defendant.

In his application for Assistant Manager at the North End Garage, plaintiff indicated that he had a valid driver's license. Unbeknownst to defendant, plaintiff never obtained a Massachusetts driver's license, instead opting to keep his Connecticut license.  In February 2003, plaintiff's Connecticut driver's license expired, and in March 2003, plaintiff attempted to procure a Massachusetts driver's license.  However, he was informed that he had a lien on his license from a 1998 rental car accident, precluding him from acquiring a new license.  This was apparently the first time that plaintiff discovered the lien.

In May 2003, defendant conducted a driver's license audit of all valet drivers and management employees at the North End Garage.  Plaintiff was unable to produce a valid driver's license for his direct supervisor, Robert Caliri ("Caliri").  In a

---

[1] Unless otherwise noted, the following facts are compiled from Defendant's Concise Statement of Material Facts, Mar. 9, 2005, and Plaintiff's Concise Statement of Material Facts, Mar. 31, 2005.

subsequent conversation with Karen Poliseno ("Poliseno"), Human Resources Manager for defendant, plaintiff admitted that he did not have a valid license.  He reiterated this information at a meeting on May 22, 2005, with Poliseno and Edwin Crean ("Crean"), Senior Operations Director for defendant, and explained the situation with his lien.

According to Caliri, plaintiff's duties at the North End Garage included "supervising the valet employees, performing administrative tasks such as compiling daily reports and collecting payments from monthly parkers, *and parking and moving cars on a regular basis*."  Aff. Robert J. Caliri ¶ 4 (Feb. 28, 2005) (emphasis added).  Plaintiff admitted that it was his job to occasionally move and park customer cars.  Dep. Pl. 65:1-66:13 (June 28, 2004).  Although Caliri stated that he observed plaintiff moving cars both before and after the expiration of his license, Aff. Caliri ¶¶ 5, 10, plaintiff contends that he never moved cars after the expiration, Dep. Pl. at 66:14-24.

Soon after his meeting with plaintiff, Crean recommended to Michael Beck ("Beck"), Regional Manager for defendant, that plaintiff's employment be terminated.  Crean provided several justifications for plaintiff's termination.  First, plaintiff could not comply with the "condition of employment at Central Parking that all managers, assistant managers, and management trainees of valet parking facilities, as well as all valet drivers, have valid driver's licenses."  Aff. Edwin Crean ¶ 8 (March 2, 2005).  Moreover, plaintiff had failed to inform his

employer of the lien on his license until the audit in May 2003,
even though he had known about it since February 2003.

Crean believed that plaintiff's silence violated two
policies set forth in defendant's Employee Handbook.  First,
employees are required to inform their employer of any changes in
status.[2]  Id. ¶ 9, Ex. A.  Second, and more substantially, Crean
claimed that plaintiff's silence constituted a "misrepresentation
of facts and falsification of records" -- that plaintiff "had
essentially lied to Central Parking concerning the status of his
driver's license."  Id. ¶ 11.  As set forth in the Employee
Handbook, such an offense is a specific ground for termination.
Id. ¶ 9, Ex. B.  Finally, Crean believed that, as an Assistant
Manager, plaintiff was "expected to not only follow but also to
enforce Central Parking policies and procedures."  Id. ¶ 9.

Beck approved Crean's recommendation, and plaintiff's
employment was terminated on June 2, 2003.  Plaintiff applied for
relief through the Equal Employment Opportunity Commission
("EEOC"), alleging employment discrimination; however, after an
inquiry, his claim was dismissed for failure to establish a
statutory violation.  Aff. Sandra E. Kahn Ex. B, EEOC Ltr. (Aug.
27, 2003).  Plaintiff commenced legal action against defendant on
November 26, 2003, under the same claim of employment
discrimination on the basis of race, color or national origin.
Pl.'s Compl. 5 (Nov. 26, 2003).

---

[2] It should be noted that a change in the status of one's driver's
license is not explicitly listed as necessitating notice to one's employer.

In support of his case, plaintiff asserts the disparate
treatment of other Central Parking employees.  Primarily, he
points to two non-Ethiopian valet drivers, Abdurashid Abdulahi
("Abdulahi") and Rafael German ("German").  Both drivers were,
like plaintiff, unable to produce a valid driver's license during
the audit; however, unlike plaintiff, they were not fired, but
rather received only written warnings.  It is plaintiff's
argument that discrimination may be inferred from this disparity,
even though, unlike him, the drivers were able to renew their
licenses within a short period of time.

As a further example of disparate treatment, plaintiff
states that Guiseppe Verdi ("Verdi"), another non-Ethiopian
employee of defendant, was promoted within defendant's hierarchy
even though he lacked a valid license.  Verdi's employment ended
on March 13, 2002, before defendant audited all valet employees.

Lastly, plaintiff identifies two additional Ethiopian former
employees as corroborating examples of defendant's discriminatory
animus: Ayelew Makonnen ("Makonnen"), who was fired in November
1998, and Solomon Lemma ("Lemma"), who was employed from 1985 to
1998.  As discussed infra, these examples -- especially that of
Lemma, who was actually promoted -- end up damaging plaintiff's
case more than supporting it.

III. **LEGAL ANALYSIS**

A.   **The Summary Judgment Standard**

Summary judgment is appropriate when "the pleadings,
depositions, answers to interrogatories, and admissions on file,

together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A "material" fact is one that possesses "the capacity to sway the outcome of the litigation under the applicable law." Nat'l Amusement v. Town of Dedham, 43 F.3d 731, 735 (1st Cir. 1995). Significantly, all evidence must be construed "in the light most favorable to, and drawing all reasonable inferences in favor of, the nonmoving party." Feliciano de la Cruz v. El Conquistador Resort & Country Club, 218 F.3d 1, 5 (1st Cir. 2000).

### B.    *McDonnell Douglas* Burden-Shifting Analysis

Employment discrimination claims filed pursuant to Title VII are analyzed under the McDonnell Douglas burden-shifting framework. Kosereis v. Rhode Island, 331 F.3d 207, 212 (1st Cir. 2003); see McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973). First, the plaintiff must establish a prima facie case of discrimination. Dichner v. Liberty Travel, 141 F.3d 24, 29-30 (1st Cir. 1998); see infra Part III.B.1. This initial burden is "not onerous," but rather "quite easy to meet." Mesnick v. General Elec. Co., 950 F.2d 816, 823 (1st Cir. 1991). If the plaintiff is able to pass this first hurdle, the burden then shifts to the employer, who must provide a legitimate, non-discriminatory reason for its action. Dichner, 141 F.3d at 29-30.

Finally, if the employer is able to meet its production burden, the burden shifts back to the plaintiff, who must demonstrate that the employer's stated reason was a pretext for the alleged discrimination.  <u>Id.</u>  There is "no mechanical formula" for determining whether the plaintiff has presented sufficient evidence of pretext to survive summary judgment. <u>Thomas v. Eastman Kodak Co.</u>, 183 F.3d 38, 57 (1st Cir. 1999). Accordingly, the court must weigh all evidence on a case-by-case basis.  <u>Id.</u>; <u>see also</u> <u>Goldman v. First National Bank of Boston</u>, 985 F.2d 1113, 1119 (1st Cir. 1993) (totality of the circumstances must permit reasonable inference of pretext).

### 1.    It is unnecessary to decide whether plaintiff can prove a prima facie case of discrimination.

To demonstrate a prima facie case of employment discrimination, the plaintiff must show that: "(1) he is a member of a protected class; (2) he was qualified for the job; (3) the employer took an adverse employment action against him; and (4) the position remained open or was filled by a person with similar qualifications."  <u>Kosereis</u>, 331 F.3d at 212-13.  At the prima facie stage, a plaintiff is not required to produce comparative evidence of disparate treatment; rather, the time for such considerations is at the pretext stage.  <u>Id.</u> at 213; <u>Conward v. Cambridge School Comm.</u>, 171 F.3d 12, 19 (1st Cir. 1999).

The main hurdle for the plaintiff at this stage is the second prong of the prima facie case -- whether, given his lack of a valid driver's license, he was qualified for the job. However, such a decision is not necessary at this stage.  In

order to focus on the more salient inadequacies of plaintiff's case later in the McDonnell Douglas process, like past courts, this court assumes, without deciding, that plaintiff has satisfied his prima facie burden.  See, e.g., Byrd v. Ronayne, 61 F.3d 1026, 1031 (1st Cir. 1995); Rodriquez-Cuervos v. Wal-Mart Stores, Inc., 181 F.3d 15, 20 (1st Cir. 1999); Lewis v. City of Boston, 321 F.3d 207, 217 (1st Cir. 2003); Feliciano de la Cruz, 218 F.3d at 5; Diaz Diaz v. Crowley Liner Services, Inc., 281 F. Supp. 2d 340, 347-48 (D.P.R. 2003).

> **2.    Defendant clearly meets its burden of producing legitimate, non-discriminatory reasons for plaintiff's discharge.**

Assuming the plaintiff is able to establish a prima facie case, the burden shifts to the employer to present a legitimate, non-discriminatory reason for the plaintiff's termination.  See McDonnell Douglas, 411 U.S. at 802.  An employer "need only produce enough competent evidence, taken as true, to enable a rational factfinder to conclude that there existed a nondiscriminatory reason for the challenged employment action." Ruiz v. Posadas de San Juan Assocs., 124 F.3d 243, 248 (1st Cir. 1997).

In the instant case, defendant easily meets its production burden.  Indeed, it provides several legitimate, non-discriminatory reasons for plaintiff's discharge, including plaintiff's lack of a valid license, see infra Part III.B.3, and his decision to refrain from informing defendant of the expiration of, and lien on, his license.

**3.    Since plaintiff cannot prove that he was treated differently than other similarly situated employees, he cannot meet his ultimate burden of proving that defendant's stated reasons for his discharge were actually a pretext for discrimination.**

Once the defendant produces non-discriminatory reasons for plaintiff's discharge, the burden shifts back to the plaintiff to show that the reasons were a pretext for actual discrimination. In cases featuring employment discrimination claims at summary judgment, courts' ultimate decisions have "tended to stand or fall on whether the plaintiff adduced adequate evidence . . . [of] pretext for unlawful discrimination." Feliciano de la Cruz, 218 F.3d at 5; see, e.g., Thomas, 183 F.3d at 56; Rodriguez-Cuervos, 181 F.3d at 20. Indeed, in the instant case, plaintiff's inability to present evidence as to pretext is, ultimately, a "fatal weakness." See Rodriguez-Cuervos, 181 F.3d at 22.

Pretext may be established in several ways, including (but not limited to): evidence that the plaintiff was treated differently than other similarly situated employees; inconsistent or after-the-fact statements by the employer as to the justifications for discharge; or, further evidence suggesting the employer disbelieved its stated reasons for termination. See Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 55-57 (1st Cir. 2000); Kosereis, 331 F.3d at 214-16; Mesnick, 950 F.2d at 824. It is the first option -- disparate treatment -- on which plaintiff focuses the thrust of his argument.

**i.    Disparate Treatment**

In a disparate treatment claim, "the plaintiff has the burden of showing that [he] was treated differently from persons situated similarly *in all relevant aspects*."  Smith v. Stratus Computer, Inc., 40 F.3d 11, 17 (1st Cir. 1994) (internal quotation marks omitted).  Although the proposed analogue need not be a perfect replica of the plaintiff, Perkins v. Brigham & Women's Hosp., 78 F.3d 747, 751 (1st Cir. 1996), the plaintiff "would have to show that [he] was similarly situated to [other employees] in terms of performance, *qualifications*, and conduct, 'without such differentiating or mitigating circumstances that would distinguish' their situations," Smith, 40 F.3d at 17 (citing Mitchell v. Toledo Hosp., 964 F.2d 577, 583 (6th Cir. 1992)) (emphasis added).  The general test is whether a "prudent person, looking objectively at the incidents, would think them roughly equivalent and the protagonists similarly situated." Rodriquez-Cuervos, 181 F.3d at 21 (citing Dartmouth Review v. Dartmouth College, 889 F.2d 13, 19 (1st Cir. 1989)).

For his analogues, plaintiff first offers two non-Ethiopian valet drivers -- Abdulahi and German -- who, unlike himself, were not fired when found without a valid license during the May 2003 audit.[3]  Plaintiff claims that this disparate treatment is

---

[3] As stated above, plaintiff also attempts to contrast his treatment with that of Verdi, a white ex-employee who was not fired despite allegedly lacking a valid license; and to compare his treatment with that of Makonnen, an Ethiopian ex-employee who *was* fired.  However, the two analogues are not persuasive in the least.

Verdi is not a valid comparison to the plaintiff for several reasons. Most significantly, the only shred of evidence that plaintiff offers of Verdi's lack of a valid license is that Verdi personally told plaintiff of the fact; however, there is no concrete evidence to support this point -- no

representative of defendant's discriminatory animus.  The valet

drivers are similarly situated to him, plaintiff argues, because

they both indicated that they were in possession of valid

licenses on their respective job applications, and then both

concealed their unlicensed status from defendant until the audit.

But, while plaintiff was fired for those actions, the non-

Ethiopian valet drivers were treated differently: they were

merely warned.  Plaintiff finds this fact particularly troubling

because the valet drivers' central responsibility was to drive

cars -- emphasizing their absolute need for a valid license --

whereas plaintiff only occasionally had to do so.  See Pl.'s Opp.

Def.'s Mot. Summ. J. 4 n.2 (Mar. 31, 2005).  Plaintiff contends

that discrimination is the only explanation for this disparity.

At the same time, defendant questions whether a prudent

person would consider the valet drivers to be similarly situated

to plaintiff.  First, as an Assistant Manager, plaintiff

obviously held a different -- and more senior -- position than

---

record that defendant ever knew or had reason to suspect that Verdi lacked a
valid license.  See Def.'s Summ. J. Mem. 8 n.7 (Mar. 9, 2005).  Moreover,
plaintiff appears to lack a general understanding of the circumstances
surrounding Verdi's employment and termination, as he makes clear at his
deposition.  See Dep. Pl. at 23-24.  Also, Verdi's employment ended on March
13, 2002, over a year before the May 2003 driver's license audit; therefore,
as explained by the EEOC, Verdi was not similarly situated to plaintiff, since
the audit is arguably a "material" aspect of plaintiff's situation.  See Aff.
Kahn Ex. B, EEOC Ltr. ¶ 3; Perkins, 78 F.3d at 751; see also Hilton v. Wyman-
Gordon Co., 624 F.2d 379, 383 (1st Cir. 1980) (court may use EEOC findings as
significant evidence).

Plaintiff next offers the termination of Makonnen as further proof of
defendant's discriminatory habits.  This analogue is weak at best.
First, Makonnen was fired by defendant in November 1998, approximately four
and a half years before plaintiff's discharge, so, like Verdi, is arguably not
similarly situated to plaintiff in all relevant aspects.  Furthermore,
Makonnen conclusively testified that he does not believe he was terminated
because of his Ethiopian national origin.  Dep. Ayelew Makonnen 39-40 (Oct.
21, 2004).

his two proposed analogues, who were, in defendant's terms, "rank and file" employees.  See Def.'s Summ. J. Mem. at 8. Accordingly, he could rationally be held to a higher standard of conduct by defendant, and punished more severely for lacking a valid license, even though a license is more central to the job of a valet driver.

But the most striking difference between plaintiff and the two valet drivers is one of qualifications.  While Abdulahi and German were successfully able to renew their respective licenses within a short period of time following the audit, plaintiff, because of the lien, was unable to do so.  Indeed, plaintiff did not even attempt, either after the audit or during the instant action, to suggest when -- if ever -- he could obtain a valid license.  It is on this point that plaintiff's argument falters, for he cannot show that he was similarly situated to his proposed analogues "in terms of . . . qualifications": while defendant was reassured that Abdulahi and German were qualified to operate cars soon after the audit, defendant had no comparable assurances from plaintiff.  See Smith, 40 F.3d at 17.

To show that he was in fact qualified for his job, plaintiff offers evidence that a valid driver's license was not a mandatory or clear-cut requirement of his position.  First, there is no written rule explicitly stating that Assistant Managers must have a valid license.  Second, the May 2003 audit was the first of its kind, demonstrating that defendant did not value valid licenses enough to routinely check for them.  And irrespective of whether

a valid license was necessary, plaintiff states that, while he occasionally drove and parked cars during the period in which he had a valid license, he never did so after his license expired.[4]

While there is no explicit driver's license stipulation on the record, all anecdotal evidence supports defendant's stance that a valid license was required.  For example, Mussi Gizaw ("Gizaw"), an Ethiopian former employee of defendant (whom plaintiff deposed as a witness, supposedly in support of his claim of discrimination), testified that, in his opinion, plaintiff was required to have a valid license.  Dep. Mussi Gizaw 20 (Oct. 25, 2004).  Lemma, who was at one time an Assistant Manager for defendant (and later promoted to the position of Operations Manager), articulated an equivalent opinion.  When asked at deposition whether a driver's license was a requirement for an employee at a valet location, Lemma responded, "Yes.  It's common sense, not only the law, but you have to have somebody who has a driver's license."  Dep. Solomon Lemma 19:5-12 (Oct. 25, 2004).  Additionally, even if the May 2003 audit was the first of its kind, it was an audit nonetheless, and provides ample evidence that a valid driver's license was a significant requirement for employment.  Def.'s Summ. J. Mem. at 6.

---

[4] There is some reason to doubt the veracity of this statement, as plaintiff's testimony has been somewhat inconsistent.  For example, in his EEOC hearing, plaintiff claimed that he "never had reason to drive (valet park) customer cars."  See Def.'s Summ. J. Mem. at 5 n.3.  This statement is in direct contradiction to his testimony in the instant proceedings, where he has admitted to occasionally driving cars.  See Dep. Pl. at 65:1-66:13. However, this Court is obliged to resolve all ambiguities in favor of plaintiff, the non-moving party at summary judgment, and therefore must give him the benefit of the doubt on this point.

Moreover, even if it is not indisputably clear that
Assistant Managers were explicitly required to have a valid
license, plaintiff concedes that he was at least occasionally
forced to drive customer cars.  As his supervisor, Caliri, notes,
"[i]t is likely that [plaintiff] had to park or move a car at
least once almost every day that he worked."  Aff. Caliri ¶ 5.
Caliri continues, more specifically,

> [t]here were also times when [plaintiff]
> would be the only employee available to park
> or move cars.  For example, [plaintiff's]
> schedule . . . included working on Sundays
> from noon-8:00 p.m.  There was only one other
> attendant on duty from 7:00 a.m.-3:00 p.m.;
> if that attendant needed to take a bathroom
> break or to leave the garage for lunch,
> [plaintiff] would be the only employee
> available to park or move cars.

Id.  There is, also, reason to question plaintiff's statement
that he never moved cars after his license expired, as Caliri
alleges that he saw plaintiff driving cars during that period.
Aff. Caliri ¶¶ 5, 10.  But even assuming, as the Court must at
summary judgment, that plaintiff did not move cars after his
license expired, his admission about occasionally driving cars at
work indicates that there was always the possibility that he
would have to drive.  This potential alone was enough for
defendant to require that plaintiff possess a valid driver's
license for employment.

Thus, even without a written requirement for a valid
driver's license, a rational fact-finder would have to find that
a license was at least a significant and relevant aspect of
plaintiff's employment in a valet parking garage -- important

enough that lacking one would distinguish plaintiff's situation from other employees in possession of valid licenses.  See Smith, 40 F.3d at 17.  Consequently, "the prudent person, looking objectively at the incidents," Rodriguez-Cuervos, 181 F.3d at 21, would not consider plaintiff similarly situated to Abdulahi and German "in all relevant aspects," see Smith, 40 F.3d at 17. Plaintiff, therefore, fails to make a successful claim of disparate treatment.

### ii.  Defendant's credibility

Further undermining plaintiff's pretext claim is the lack of evidence to suggest that defendant disbelieved its reasons for firing plaintiff.  See Feliciano de la Cruz, 218 F.3d at 7 (in appraising pretext, the question is not whether the given reasons were true, but rather whether the employer actually believed the reasons to be true).  Defendant's original reasons, as stated in its termination letter to plaintiff, are both credible and consistent with its depositions and affidavits.  Cf. Dominquez-Cruz v. Suttle Caribe, Inc., 202 F.3d 424, 431-32 (1st Cir. 2000).

Thus, for the reasons stated above, plaintiff cannot demonstrate that defendant's stated reasons for his termination constituted "a sham intended to cover up the employer's real motive."  Mesnick, 950 F.2d at 824.  Plaintiff has failed to satisfy his final burden, pursuant to McDonnell Douglas, to show pretext; consequently, summary judgment is appropriate.  See Mack v. Great Atlantic and Pacific Tea Co., 871 F.2d 179, 182 (1st

Cir. 1989) (summary judgment affirmed where plaintiff was unable to show that "comparably credentialed" employees received preferential treatment).

## IV.    CONCLUSION

Plaintiff has presented insufficient evidence from which a rational fact-finder could conclude that defendant's reasons for his discharge were a pretext for discrimination.  Accordingly, defendant's motion for summary judgment is **GRANTED**.


**SO ORDERED.**

**Dated: August 26, 2005**                              **s/NANCY GERTNER, U.S.D.J.**